Good morning, Judge Ravner, Judge St. Eve, and Judge Pryor. First of all, it's my privilege to represent Jose Antonio Mireles, Jr. on this appeal. He raises three issues from his trial, which are all evidentiary, and three issues from his sentencing with which I would like to begin. First of all, Kevin Lerner, who is a scholar who discusses the problem with sentencing defendants based on the quantity of drugs, says that while sentencing table was pegged to high-level kingpins, kingpins have largely failed to show up for the full incarceration feast. Instead, since the guidelines— Could I ask you a huge favor? Sure. Do you mind just moving toward the mic so that you will be recorded? Sure. Okay, add the six seconds that I'm speaking. Go ahead. Okay. So let me just start this quote again. I think it's appropriate to frame the sentencing issues that Mr. Mireles raises. While the sentencing table was pegged to high-level kingpins, kingpins have largely failed to show up for the full incarceration feast. Instead, since the guidelines went into effect, federal prisons have been increasingly populated with kingpins, underlings, couriers, mules, street-level dealers, and others. And that's clearly the case here. Mr. Mireles was a low-level and rather minor participant in a very large drug conspiracy. He was the last defendant to be brought into custody, and he received the largest sentence. To show the terrible disparity with respect to him and the head of the leadership of this drug organization, Mr. Roque, Mr. Roque received a sentence of 180 months incarceration after having testified to being responsible for 3,000 to 5,000 kilos of cocaine and hundreds of kilos of heroin trafficked into the United States and across the country. Well, you know, Ms. Gimby, two things happened. One is he bled, he became a witness. We know this. The second thing is that he tried to flee, and he did flee, and he evaded prosecution for a year and a half. So that surely had to be in Judge Kendall's thoughts. Certainly it was, Your Honor, but the size of the disparity is enormous, because even though Mr. Roque bled, he received the 180 months. Mr. Mireles received 342 months. Ms. Gimby, you know, how is your argument impacted by the fact that at the time your client was sentenced and received the 342 months, Mr. Roque's sentence was 420 months? It wasn't until substantially after your client's sentencing that the government moved to have it reduced for his cooperation, and that his sentence was reduced. So you're making a disparity argument based on information that came about after your client was sentenced. Certainly it was projected prior to, because Mr. Roque was part of a cooperation agreement. His cooperation was ongoing, and part of his cooperation was testifying against Mr. Mireles. I'm sure the court could anticipate that the government might come in and ask for a reduction, but what that reduction looked like or what we have are the facts at the time that your client was sentenced, and your disparity argument at the time of sentencing fails, because he had almost 100 months more than your client at that time. I'm not aware of any case law anywhere that says we can look at the disparity argument in the rearview mirror. Well, Judge, this is only one part of my disparity argument, so even if you don't look at it in the rearview mirror, and I say that it's not. It's typically recognized that at the time a person, Mr. Roque, testifies that his sentencing is going to occur after the person that he testifies against. But the court has, well, he had been sentenced already, and it was reduced pursuant to his cooperation. The court has no idea what that reduction might look like. That's true, but she does know at the time that she sentenced Mr. Roque what sentence she gave to Mr. Mireles, and certainly what sentence she gave to every other person on that conspiracy, all of whom . . . But how can your client make that argument? I don't want to take up all your time, but I think that's an uphill battle for you based on comparing it to Mr. Roque's sentence. Well, we need not tally with Mr. Roque alone. There were eight or 10 other defendants, and with the exception of two, he received a substantially greater sentence than all of the other defendants by over 100 months, even though their drug quantities were greater than his. And, of course, again, they pled and he didn't, but still what you have is somebody looking at the criminal justice system and asking, is it fair? And when you look at a person who is a very low-level participant in a large conspiracy and every other individual save two receives lesser sentences than he does, despite their involvement in more drugs than he was, that doesn't look fair. And it brings the question of the integrity of the system up. Should we look, then, at the sentencing guideline calculation and those enhancements to determine whether or not if that calculation was correct? And the reason why I ask that, if we find that that calculation was correct, would we reach this unwarranted disparity argument the same way that you're asking us to approach it in the sense that – go ahead. I'm happy to answer your question because, no, you would not have to. It's sort of a little bit of the cart before the horse, but I did want to frame it as a matter of general integrity of the system and injustice. But if we take the issues one by one, as you suggest, which we did in our brief, with respect to the drug calculation, it's our position that the court did not rely on reliable evidence in determining what the drug quantity was for which Mr. Morales should be held responsible. He was clearly responsible for picking up five packages which were documented because the way the system worked was that a name had to be provided to Amtrak to pick up packages and only the person whose name was on the package could pick it up. So, clearly, Mr. Morales was responsible for five packages. How was it clearly erroneous for the district court to also rely on Mr. Roque's testimony who testified that not only did Mr. Morales participate in the distribution of the drugs when he picked up the packages in his name, but also when his name wasn't on delivery and they came into Chicago when he was there? There was no actual evidence of that beyond Mr. Roque. How was it clearly erroneous to rely on Mr. Roque's testimony and the fact that we know there were other packages coming in not in his name? Because Mr. Roque's testimony to that effect was uncorroborated because Mr. Roque admitted on the stand that he lied to Mr. Morales, he lied to law enforcement, he lied to the person who was his contact at Amtrak, and basically to everyone else to serve his purposes. But the jury believed him. The jury believed him. It's unclear what part of what he testified to they believed. Well... Because, for instance, one example... But that's not how we parse it out clearly erroneous. Well, it is unsupported information, uncorroborated information that is not based on the evidence at trial. And the district court observed his testimony. The court was in the position to assess his credibility. So you're asking us essentially to find error and find a determination clearly erroneous where the court observed the credibility and, as Judge Rovner pointed out, the jury believed him. Well, the jury didn't believe him with respect to the specific quantities of drugs. They did find over 5 kilos, but not anything further than that. And with respect to the alleged heroin, they only found a detectable amount, meaning they didn't believe him with respect to his participation in picking up or having anything to do with or knowing that the packages that were delivered to Ms. Cervantes were heroin instead of cocaine. But, I mean, look, it's... We have to live with the laws that stands. And, you know, he's responsible for any drug and all drug transactions that were reasonably foreseeable to him. And he was charged, of course, with the 15 packages that arrived while he was in Chicago, while he was present. He was charged with 10 kilograms per package, which was the smallest amount. That brocade stated would be in each of the packages. So, I mean, it... And it tied to the evidence that presented at trial. I mean, what... Your Honor, I think that if you look at all of the evidence presented at trial, it's not consistent with that. I mean, with respect to the other packages that arrived in Chicago, there wasn't any specific evidence that Mr. Morales was involved in those packages. And, in fact, Mr. Roque testified that he had 30 to 50 workers working for him. And so he was not clearly attached to those, other than his presence in Chicago, which was clearly attached to the packages that he picked up. The drug quantity is not the only problem with the sentencing. The second is the assessment of two levels for an increase for obstruction of justice, which was based on flight, and an additional two levels for reckless endangerment, also based on that same flight. I'm sorry. So the government is suggesting that the obstruction of justice enhancement was focused more so on the year and a half where Mr. Rondellis didn't turn himself in. So looking at the sentencing transcript, is that the reasoning that the court provided for the obstruction of justice enhancement? It wasn't clear that that was taken in isolation. What the court did parse was the flight from law enforcement and the reckless endangerment. So there was that. It wasn't clear, as I recall, that the court was focusing specifically on the year and a half that he was out. How he managed to drive with handcuffs behind his back, which obviously had to come to the front somehow, is just unbelievable. Well, the problem with the obstruction, of course, is that the obstruction guideline, Application Note 5D, provides that fleeing from law enforcement is not ordinarily a basis for obstruction. And the reckless endangerment one, Application Note 1, provides that this is not usually used in conjunction with any other equal or greater assessment under Chapter 2 or Chapter 3. So it's our contention that neither one of those enhancements should have applied. And at the very most, only one of them, because they were conflicting according to the plain language of the reckless endangerment. Well, the court found one enhancement based on his reckless endangerment, getting in the truck and driving toward the agent in an aggressive manner, and the other one based on evading the administration of justice. So those are two separate incidents. They may have occurred at the same time, but the specific finding was based on two separate incidents. My contention, Judge, would be that that parses it a bit too thin. I mean, it's based on his flight, and the manner of his flight was that he got into this truck. And the description of the agent and the description of the only other civilian witness there did not correspond. But I notice that the parties have characterized this as flight. Why would this not have been escaped from custody? Why are we still characterizing it as an arrest, a flight from arrest? Because that's what was happening, that he was taken. He was under arrest, and when they were stopped in traffic, and I suppose in California it's much worse than it is here, and he hopped out of the car. So he was never in custody? Well, he was in custody in the sense that he was never in jail custody. This was at the time of his arrest, and he was in custody with respect to having been handcuffed, but somehow that didn't stop him from getting out and leaving and getting into this truck. Now, the problem with holding him responsible for reckless endangerment is that what the civilian witness testified was that he saw this man run and get in the truck, and there were two people in black behind him shooting at him. But the civilian witness testified that he was hiding in a drainage pipe after Mr. Morales approached him. So, I mean, isn't it possible that Mr. Morales drove the truck at Agent Kativa while the civilian witness was hiding in the drainage pipe, and the civilian witness only emerged after Mr. Morales swerved around the agent? Well, I suppose that's possible, but that's not the evidence, and we don't know on that point. And the agent also was shooting at Mr. Morales. The fact of the matter is no harm accrued to her or to anyone else. Well, thank God. Thank goodness, yes. But typically when reckless endangerment has been found, as indicated in the cases that were cited by the government, SWOPE and the others, there actually is some kind of injury and endangerment to the people that are involved. That might be typical, but that's not required. The guidelines don't require that. The case law doesn't say that's mandatory. Of course, and of course the guidelines are not mandatory either. The judge was well aware of that here. But the suggestion is that she over-penalized him based on the facts of a single incident by assessing two points for obstruction based on the flight, which is ordinarily not used to enhance, and the two points for the reckless endangerment, which ordinarily is not used when there is an obstruction enhancement. So it should have been, in our view, neither or, at the very least, just one of those enhancements and not both. And that would have made certainly a significant difference in the type of time we're talking about for Mr. Morales, and it would have brought him more in line with the other individuals who were more culpable than he and received lesser sentences. Thank you, Ms. Gandino. Thank you, Judge. Thank you. Ms. Chung. Good morning. Good morning, and may it please the Court. Ashley Chung on behalf of the United States. This panel, this Court, should affirm the defendant's conviction and sentence. Beginning with the sentencing issues that counsel for defendant raised, as this Court noted, the drug quantity here was one that was not Certainly, your Honor. Yes. And so how is that distinction made between the two level enhancement for reckless endangerment during flight and the obstruction enhancement? And where is it in the transcript? Yes, your Honor. So I think it's in the transcript, the sentencing transcript, around the discussion on pages 19 through 23, and I think in some ways, the discussion ends up overlapping. The court doesn't address just obstruction and just reckless endangerment because of the order in which they were addressed. They're sort of discussed together over the course of discussing the objections to both enhancements. But what do you mean, sort of addressed together? Pardon? I mean, what does that mean, sort of? I mean, they're too distinct. We're talking about a lot of years of a man's life. Yes, your Honor. Yes. And when I say that they were discussed together, I only mean that the district court and the parties discussed both enhancements at the time. For example, while discussing the obstruction enhancement, also discussed the circumstances of defendants' flight across the highway and grabbing that car that also contributed to the reckless endangerment finding and vice versa. So let me ask the question more pointed because we're reviewing the court's reasoning for imposing an enhancement. Yes. And so I'm not asking where is the discussion. I'm asking where is the court's reasoning for imposing the obstruction enhancement because I'm trying to distinguish the court's reasoning going to Judge Rovner's point for the reckless endangerment enhancement and the court's reasoning for finding obstruction. Yes. So I think in that portion of the transcript, the district court noted, for example, that after defendant flees from custody and all of his co-defendants are arrested, their indictments are unsealed and then defendant remained out of custody and a fugitive for over approximately a year and a half, the district court notes, it's common sense that he knows that all of his co-conspirators who he was friends with, that he knows at this point that they have been arrested and they have been charged with the conspiracy. How many individuals were involved in the trial? Ultimately, the trial was only the defendant. I'm sorry, in the case I'm in. Yes. Because he's the only one that went to trial. That's correct, Your Honor. And I believe it was 10 other defendants who were charged in this conspiracy. There was also a different conspiracy that sort of broke off from Mr. Edgar Roque's conspiracy and that ended up being a separate case that was handled in this district court but before a different judge. Do you think there's any conflict between Agent Katiba's testimony that he drove the truck at her and the civilian's testimony that he saw the truck driving away from the agent? I don't think there is necessarily a conflict there and there's a few reasons for that. I think first, the point that Your Honor raised about the civilian witness also talking about how he was hiding inside a drainage pipe at the time because he was concerned that there was risk there. That could explain, for example, why he saw things from a different vantage point or at a different time than from what Special Agent Katiba saw while she was pursuing defendant. I think also, and the district court highlighted this, that there was also the fact that the civilian witness was simply, he was in a, I think the court said, a different place, like a different state of mind than the defendant who had been involved in a drug traffic conspiracy versus the civilian who's just startled on the scene and does not know what is going on. Finally, I think here, even if there were some conflict, for example, between Special Agent Katiba testifying that the car was speeding versus the civilian testifying that at least at the time he saw the car, he thought it was going at moderate speed, where there's two witnesses who are giving different descriptions of what they observed or saw, the district court's decision to credit one witness's account over another cannot rise to clear error. But just going back to the obstruction point, I do think here that in the sentencing transcript, the judge noted that here there was a period of time after defendant's flight where it's common sense that he would know at some point that it's in connection with this indictment, it's connection with this pending case, and nonetheless, he remained a fugitive. There was testimony at trial about some of the efforts that were made during that time in order to track defendant down. He was at home. He was ultimately arrested at home, Your Honor. So what other efforts other than an arrest warrant and going to his house was implemented? That's where in the record did he obstruct or significantly impair the prosecution? Yes, Your Honor. He escapes or flees and goes home. Yes. Fifteen months later, he's found at home. Yes, Your Honor. However, that's 18 months later. Eighteen months later, he's found at home. I understand what the record says. What I'm listening for from the government is what evidence do we have that that impacted the prosecution, significantly impacted the prosecution? Yes, Your Honor. At trial, and it's in the trial transcript at page 1073, for example, there was testimony about DEA Chicago as well as DEA in LA coordinating on various leads, including seeking new information about defendant, trying to track defendant's phone calls, reaching out to known associates, and ultimately coordinating with the marshal service after defendant was classified as a fugitive. I think the evidence is that they only went to his home twice. Twice. And it was the second time or third time that he was there. The concern is, as you can tell from our questions, that obstruction of justice enhancement is not proper for just fleeing. The note says that. Our case law is pretty clear on that. So what evidence is there in the record, because it's a little hard to tell at sentencing, that Mr. Morales engaged in more significant efforts to evade capture or somehow increase the burden on the investigation or prosecution. And let me just add one more thing in there. Our case law also says that it is not obstruction if you just fail to turn yourself in, which is what it sounded like some of the evidence or some of the argument went to. Understood, Your Honor. So I think that the best evidence here is that portion of the trial transcript that does describe these other efforts that were made by DEA in Chicago as well in Los Angeles, as in Los Angeles, in order to try to locate defendant with examples of the types of actions that they took. But can we go to the trial transcript? Yes, Your Honor. If the court doesn't provide it in the sentencing transcript for purposes of the enhancement? I think because the same judge here presided over the trial as well as over the sentencing, that it's reasonable that the judge would have known about and could have relied on information at the trial, but also at the sentencing, the government also raised during the sentencing hearing the fact that referenced this testimony from trial and also referenced the fact that it was ultimately, yes, the fact that the defendant was arrested at his home 18 months later, but that in the interim it wasn't as though the agents had not been, for example, conducting surveillance, et cetera, during that time. At his home? Twice. Yes. That's the problem. Yes, Your Honor. He goes home and they can't find him? He was ultimately at home when they do find him 18 months later, but I think otherwise the record doesn't speak to, for example, whether he was at home during that entire time. Is there any evidence that he wasn't at home? I think that evidence comes from the references to it. Admittedly, it ultimately is limited instances of surveillance in the interim, but also the fact that authorities were still making these additional efforts to try to locate defendants. Out of fairness, this wasn't really the thrust of the obstruction argument at sentencing. The focus was really on whether or not he knew agents were coming. That's correct. But there still has to be a sufficient basis to uphold the obstruction enhancement. I think that's right, Your Honor, but I think here nonetheless that there was sufficient evidence here and there were sufficient findings made. But what are they? It's ultimately what I've already mentioned to Your Honors, and I understand that it's not anywhere in the transcript. It's nowhere. Pardon? It's nowhere in the transcript, these reasons that you're offering this morning, because I'm reading the transcript, and it says, it's absolutely common sense that he knows everybody was taken down, which is the reason you've offered. It's a public indictment. You Google it. You find out that everybody is under indictment, and it's unreasonable to think that the people that I was dealing with is not checking that out. It's not aware of the public indictment. So it seems to be the reasoning given by the court for the obstruction enhancement is because you didn't turn yourself in when you knew you had been indicted. And we have said, as a court, that's not enough for an obstruction enhancement. I think so. That's correct, Your Honor. And just to be clear, when I referenced, for example, the references in the sentencing transcript to efforts made at surveillance, that was the government presenting that argument to the district court at sentencing. I think nonetheless here, though, under this court's case law where it talks about whether— What did he do to obstruct? What did he do? I think the obstruction here basically starts from the time that he flees from the agents who are attempting to transport him to the federal courthouse. The fleeing. Yes, but it begins at that time. Where does the obstruction— I think it comes from him then for the next 18 years continuing to remain a fugitive during the time that the government is attempting to prosecute his case. He might have been in his bedroom for those 18 months. We don't know. And I think the problem is the case law doesn't support, without more, that not turning yourself in qualifies for the obstruction enhancement. If he were a fugitive— The case law suggests that you have to have something more in attempt to evade an evidence of affirmative acts, whether it's changing your name, moving, going abroad. Just not turning yourself in isn't sufficient. With your argument, I'm going home and Googling myself. No, I mean, I'm sort of half joking, but you really think that he was supposed to Google himself? No, not necessarily Google himself, Your Honor, but I think here where there's evidence that all of his co-conspirators with whom he was in regular communication have been arrested, an indictment has been sealed— Not in those 18 months, Your Honor. I'm talking about prior to everyone being arrested and prior to the takedown. So after that scenario, what would the obstruction be? I think the obstruction would still be that he flees from custody and then remains a fugitive. And I understand that this court sees the lack of record evidence about what he was doing during the interim and where he was, particularly given the fact that he was arrested at his house 18 months later, to be concerning. But I do think here that there was still obstruction within the meaning of the guidelines because it was his flight and then remaining a fugitive did make it more likely that he would burden the prosecution significantly, which is the language that this court used in the jury bay. So you're relying on the burden on the prosecution as opposed to just the remaining a fugitive aspect? That's correct, Your Honor. And for example, in just doing a review of the docket, during the time that Mr. Morales was a fugitive, meanwhile, this prosecution was progressing without him. Co-defendants were entering into plea agreements, et cetera, et cetera. And there has been reference in the case law, for example, to instances where it could burden the government's prosecution where because someone is a fugitive, other co-defendants, for example, may end up being able to negotiate different plea arrangements, et cetera, that may not have otherwise been on the table had someone been in custody and had all the co-defendants' prosecutions been proceeding at the same time. But, you know, he's about as low level as it gets. I disagree with that, Your Honor, in terms of his level of culpability. I think during the sentencing, Judge, the district court did specifically find that defendant was far from a street-level dealer, that he was among the people who were helping to connect the drugs that were coming from large producers in Mexico to the people in the United States who were then ultimately distributing it at the middle and lower levels on the street. He was basically a delivery fellow. He was a delivery fellow, but he was an integral part of this operation, and he was operating higher. You know, everyone that's involved... The sentencing disparity is something that has always been terribly upsetting. When you have, you know, this Roque who made what? How many millions was it? It boggles my mind. And, you know, he spends, like, a third of the time in prison. Understood, Your Honor, but I think here, first, as this court noted, as this panel has noted, Mr. Roque, initially, at the time that Mr. Morales was sentenced, had already been sentenced to a 420-month sentence, so one that was significantly longer than the 342-month sentence of Mr. Morales. But you better bet that he knew that if he sat there and talked about everybody else, that he was going to be rewarded. Yes, Your Honor. Because one always is. Yes, Your Honor, and I think that's fair, but I think also this court's case law makes clear that there's a difference between defendants who cooperate and those who accept responsibility and express remorse versus those who don't, and that was just some of the aggravating factors that distinguished defendant from Mr. Roque as well as other co-defendants, in addition to a number of other factors under 3553A that the sentencing court addressed. Thank you very much for your time, and we'll ask that this court affirm the conviction and sentence. Thank you very much for your argument. Ms. Gambino, you used your time, but Lady Bountiful is going to give you your full three minutes. Thank you, Your Honor, and in return, I will not take my full three minutes. Oh, take it. First of all, I'd just like to comment on a few things.  that he would know that other people were indicted, I think that's not the case. Does that matter? It does matter when you're looking at what the judge is saying. But in terms of the obstruction enhancement, how far does that go? It doesn't go that far unless you're taking the position that him being a fugitive is something that you could hold against him as obstruction. I guess that's my point. It seems like under our case law that merely being a fugitive isn't enough. That's my understanding as well, and so that is another reason why I would advocate that that be reversed. The other issue I wanted to raise, too, with respect to this notion of burdening the prosecution in the cases where that has been the case, like in Derive, for instance, the defendant arranged to get a passport, go to Nigeria, had to be extradited. So we're not talking about finding a defendant at home in California where he lives. Not the same thing. And also with respect to whether or not... In that case, there were some aliases used. There were other people that had been pulled into obstructing in the Nigerian case. Yes, and they enabled him to flee the country. And basically, Mr. Nderibe, the government's burden on the government was having him extradited at the expense of bringing him back here. Such was not the case here. There's no evidence of regular communication between Mr. Morales and anyone else. The only person that he knew was Roque because they had been high school friends, and most of the rest of the individuals on the indictment were in Chicago, not in California, where Mr. Morales lived. So it just simply isn't the case that there was any burden on the prosecution to find Mr. Morales. And we would ask that the case be remanded for resentencing. Ms. Gambino, don't go away. Okay. Because we want to thank you for accepting the difficult job that you accepted pro bono, and we want you to know how very much we appreciate the fact that you took this case and did your very best with it. Thank you. We really appreciate it. And Ms. Chung, we really appreciate the government as well and the very fine effort that you have made on behalf of the government. So thanks a lot to both. And the case will be taken under advisement.